**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 15a0153n.06**

**No. 13-1566**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ┌─────────────────────┐ |
| Plaintiff-Appellee, | ) | **FILED** |
| | ) | Feb 25, 2015 |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| THOMAS WILLIAM WOOTEN, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

**FILED**
**Feb 25, 2015**
**DEBORAH S. HUNT, Clerk**

BEFORE: DAUGHTREY, CLAY and STRANCH, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Thomas Wooten was indicted on six charges related to the possession, distribution, and receipt of child pornography. Before trial, Wooten moved to suppress physical evidence discovered during a search of his house, unwarned statements that he made to FBI agents during the search while he was confined in an agent's vehicle, and a subsequent confession he gave at the FBI office after he was "Mirandized." The district court denied the motion as to the physical evidence and Wooten's post-*Miranda* confession, but suppressed the unwarned statements Wooten made during the search after concluding that the FBI agents elicited those statements during a custodial interrogation. A jury convicted Wooten on all six counts. Wooten now appeals the district court's denial of his motion to suppress his post-*Miranda* confession, arguing that the warnings did not cure the

No. 13-1566
*United States v. Wooten*

conditions that made his initial unwarned statements inadmissible. For the reasons set out below, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2010, as part of nationwide investigation into the production and distribution of child pornography, the FBI focused on a suspect in Indianapolis, Indiana. That investigation led agents to an internet protocol (IP) address linked to 21586 Dupont Drive in Macomb Township, Michigan. Development of an operation in New Haven, Connecticut, led agents to the same IP address. The Detroit FBI then determined that Thomas Wooten lived at the Dupont Drive address, obtained a federal search warrant for the residence, and executed it. Wooten shared the house with another tenant, Christie Teltow, and Teltow's minor child, a daughter. To separate Wooten from the other tenants while conducting the search, agents handcuffed Wooten and placed him in the back of a sheriff's car. Wooten sat alone in the car for some period of time and then was moved to the back of FBI Special Agent William Fleming's car, where he remained handcuffed.

While Wooten was in Agent Fleming's car, the FBI agents asked him about his email address, about his relationship with his ex-girlfriend, who was the mother of his child, and about his access to computers in the residence. Fleming and Christianson also showed Wooten two photographs of a blond child that they had downloaded from the internet and traced to Wooten, one in which she was fully clothed and a second that showed her naked in the bathtub. When the agents asked if Wooten could identify her, he told them that she was his daughter, then three years old.

No. 13-1566
*United States v. Wooten*

After completing the search, the agents then drove Wooten to the FBI field office in Macomb County, where they gave Wooten coffee, offered him food, and gave him an opportunity to use the restroom. Some 30 minutes after arrival, the agents advised Wooten of his *Miranda* rights, secured a written waiver, and began questioning Wooten. During the ensuing interrogation, the agents asked Wooten about his email address, his computer use, his internet service, and his possession, viewing, downloading, production, and distribution of child pornography. Wooten again identified photographs of his daughter, many of them depicting her nude and some of them focused on her genital area. Following interrogation, Wooten initialed a confession drafted by one of the agents and signed consent forms allowing the agents to assume his online identity and search his cell phone.

A federal grand jury indicted Wooten on two counts of production, two counts of distribution, one count of receipt, and one count of possession of child pornography.[1] Wooten moved to suppress the images and other physical evidence discovered during the search of his house, as well as the statements he made at the FBI office. Following an evidentiary hearing, the district court denied the motion to suppress physical evidence. The district court also rejected Wooten's argument that his statements were coerced and should be suppressed on that ground. The court then ordered supplemental briefing on whether *Miranda* required suppression of Wooten's statements made at the scene and those made at the FBI office. Specifically, the parties were directed to address "whether the FBI agents elicited incriminating statements during a

---

[1] In Count 1, Wooten was charged with producing 11 images of child pornography, and in Count 3 with distribution of child pornography for emailing those photographs to another individual. Count 2 pertained to a one-minute-and-six-second video of Wooten's minor daughter performing oral sex on an adult male. Count 4 charged Wooten with distribution and arose from a detective's undercover downloading of pornographic images allegedly from Wooten. Count 5 charged Wooten with receipt of child pornography and related to Wooten's alleged downloading of 1,542 images and 103 videos. Count 6 charged Wooten with possession of child pornography.

No. 13-1566
*United States v. Wooten*

custodial interrogation before advising Wooten of his Miranda rights . . . and, if so, what effect such a violation would have on the admissibility of the written confession Wooten gave after he waived his Miranda rights."[2]

Following briefing, the district court concluded that Fleming had placed Wooten under arrest on the basis of an outstanding state warrant for unrelated domestic assault charges before he was moved from the sheriff's car to the FBI vehicle. Additionally, the district court found that "the questions asked and answered in the [FBI] agent's car constituted interrogation" for *Miranda* purposes and that the FBI agents failed to give Wooten his *Miranda* rights before questioning him at the scene. Accordingly, the statements Wooten made during the search were suppressed. However, the district court denied Wooten's motion to suppress the confession he subsequently made at the FBI office, finding that the later statements differed "in detail and content" from the first and "included additional information." The district court noted that Wooten was given his rights and executed a voluntary waiver before questioning began at the FBI office. The district court thus "decline[d] to characterize [Wooten's] two statements as one continuous statement, with *Miranda* warnings given 'in the middle,'" and concluded that the warnings "accomplished their objective," making his confession admissible at trial.

A jury convicted Wooten on all six counts, and the district court sentenced him to concurrent prison sentences, the longest of which was 30 years. Wooten now appeals his convictions on a single ground: that the district court erred in admitting his written confession.

---

[2] The admissibility of the statements made during the first round of questioning during execution of the search warrant was not challenged in the suppression motion. However, those statements were later suppressed at trial.

-4-

No. 13-1566
*United States v. Wooten*

## DISCUSSION

"In cases involving a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008). We review the evidence in the light most favorable to the defendant and will conclude that a factual finding is clearly erroneous only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).

On appeal, Wooten argues that the confession he made at the FBI office should have been suppressed at trial because it was tainted by his earlier, unwarned statements at the scene. He contends that, considering the totality of the circumstances, the *Miranda* warnings that he received were incapable of conveying to him that he had an "informed choice" to remain silent, citing the Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600, 612 (2004), and our opinion in *Pacheco-Lopez*, 531 F.3d at 427.

In *Seibert*, the Court was at pains to distinguish *Oregon v. Elstad*, 470 U.S. 298 (1985), the original "*Miranda*-in-the-middle" decision. The *Elstad* Court held that "[w]hen a prior statement is *actually coerced*, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310 (emphasis added). If the prior unwarned statement was voluntary, however, "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible," and a subsequent, warned statement will be admissible unless it was involuntary. *Id.* at 310-11. In short, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby

-5-

No. 13-1566
*United States v. Wooten*

disabled from waiving his rights and confessing after he has been given the requisite Miranda

warnings," although "the unwarned admission must be suppressed." *Id.* at 309, 318.

In the wake of *Elstad*, many police departments adopted what the *Seibert* opinion

describes as a "protocol" designed to comply with the letter of *Elstad* while at the same time

undermining the effectiveness of *Miranda* warnings. *Seibert*, 542 U.S. at 604. The technique

involves a deliberate strategy of questioning "in successive, unwarned and warned phases." *Id.*

at 604, 609. ("Although [an unwarned] statement is generally inadmissible, since taken in

violation of *Miranda*, the interrogating officer follows it with *Miranda* warnings and then leads

the suspect to cover the same ground a second time.") (citation omitted).

*Seibert*, however, failed to produce a majority opinion. A plurality of four Justices

articulated a five-factor, fact-intensive, objective test for determining "whether *Miranda*

warnings delivered midstream could be effective enough to accomplish their object[.]" *Id.* at

615. The five factors are: "[1] the completeness and detail of the questions and answers in the

first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and

setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to

which the interrogator's questions treated the second round as continuous with the first." *Id.* In

light of these factors, the plurality found the followings facts to be relevant:

> The unwarned interrogation [of Seibert] was conducted in the station house, and
> the questioning was systematic, exhaustive, and managed with psychological
> skill. When the police were finished there was little, if anything, of incriminating
> potential left unsaid. The warned phase of questioning proceeded after a pause of
> only 15 to 20 minutes, in the same place as the unwarned segment. When the
> same officer who had conducted the first phase recited the *Miranda* warnings, he
> said nothing to counter the probable misimpression that the advice that anything
> Seibert said could be used against her also applied to the details of the inculpatory
> statement previously elicited. In particular, the police did not advise that her prior

-6-

No. 13-1566
*United States v. Wooten*

> statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before.

*Id.* at 616-17 (footnote omitted). The plurality explained that "the earlier and later statements [must be] realistically seen as parts of a single, unwarned sequence of questioning," *id.* at 612 n.4, and that "it would . . . be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id.* at 614. Thus, the subsequent confession had to be suppressed because the warnings lacked "efficacy." *Id.* at 617 (holding that "a reasonable person in [Seibert's] shoes would not have understood [the *Miranda* warnings] to convey a message that she retained a choice about continuing to talk"). The plurality further noted, however, that in cases in which *Miranda* warnings were deemed to have been effective, a court should then "take up the standard issues of voluntary waiver and voluntary statement." *Id.* at 612 n.4.

Justice Kennedy issued a separate opinion concurring in the judgment and rejecting the plurality's conclusion that a "multifactor test" should apply whenever a two-stage interrogation occurs. *Id.* at 622 (Kennedy, J., concurring in the judgment). Instead, he proposed that in cases like *Seibert*, in which the police employed a deliberate two-step interrogation technique specifically designed to undermine the effectiveness of *Miranda* warnings, any post-warning statement that is related in substance to a pre-warning statement must be suppressed "absent

No. 13-1566
*United States v. Wooten*

specific, curative steps." *Id.* at 621. If officers did not deliberately conduct a two-phase interrogation, however, then in Justice Kennedy's judgment *Elstad* should continue to govern the admissibility of any post-warning statement, and the question simply would be whether the subsequent confession was voluntary. *Id.* at 622.

In construing *Seibert*, the circuit courts have disagreed as to whether the plurality opinion or Justice Kennedy's concurrence controls, resulting in a somewhat lopsided circuit split. Seven of them have concluded that Kennedy's concurrence is the controlling opinion, relying on *Marks v. United States*, 430 U.S. 188 (1977), in which the Supreme Court held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds." *Id.* at 193 (internal citation and quotation marks omitted). They agree that Justice Kennedy's concurrence was decided on "narrower" grounds than the plurality opinion, just as Justice Kennedy himself described it. *Seibert*, 542 U.S. at 622. The Second Circuit, for example, held that "*Seibert* la[id] out an exception to *Elstad* for cases in which a *deliberate*, two-step strategy was used by law enforcement to obtain the postwarning confession." *United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (emphasis added); *see also United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007); *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006); *United States v. Street*, 472 F.3d 1298, 1313-14 (11th Cir. 2006); *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Mashburn*, 406 F.3d 303, 308-09 (4th Cir. 2005).

No. 13-1566
*United States v. Wooten*

Two circuit courts have questioned whether Kennedy's concurrence can be controlling law. Noting that "[t]he plurality resisted Justice Kennedy's attempt to redirect the Court's inquiry to the intent of the interrogating officer," the Tenth Circuit noted that "[d]etermining the proper application of the *Marks* rule to *Seibert* is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the court." *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150-51 (10th Cir. 2006). The Tenth Circuit declined to decide which *Seibert* opinion controlled, however, because it concluded that the statements at issue were admissible under either the plurality opinion or Kennedy's concurrence. *Id.* The Seventh Circuit took the next step, suggesting that Kennedy's "intent-based test" was not controlling because seven of the justices (three of the four in the plurality and all four dissenters) explicitly rejected Justice Kennedy's invitation to assess an officer's subjective intent. *See United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009). But the Seventh Circuit, too, avoided deciding what rule could be derived from *Seibert* because it found that the defendant's "statements would be admissible under any test one might extract." *Id.* at 885.

In addition, this circuit and the First Circuit have avoided ruling on the issue in cases in which the outcome would be the same under either framework. *See United States v. Widi*, 684 F.3d 216, 221-22 (1st Cir. 2012) ("This court has not settled on a definitive reading but the statements here at issue pass either version of the *Seibert* test."); *United States v. McConer*, 530 F.3d 484, 497-98 (6th Cir. 2008) (ruling that "neither the plurality nor the concurrence in *Seibert* supports McConer's *Miranda* argument"); *Pacheco-Lopez*, 531 F.3d at 427 n.11 (holding that "regardless of the applicable framework Lopez's statement must be suppressed"). We conclude that the same resolution is appropriate here.

No. 13-1566
*United States v. Wooten*

The central inquiry in determining whether the admission of a warned confession that followed unwarned, inculpatory statements violated *Miranda* is whether the delayed warning given before the second statement "could function 'effectively.'" *Seibert*, 542 U.S. at 611-12. Here, the district court concluded that the warning at the FBI office was fully effective. The parties have not briefed the issues of who bears the burden of proving effectiveness and by what quantum of proof. But extrapolating from well-established principles set out in other *Miranda* cases, we conclude that *de novo* review is appropriate as to the district court's finding of effectiveness, given that the adequacy of *Miranda* warnings is treated as a question of law. *See United States v. Wysinger*, 683 F.3d 784, 798 (7th Cir. 2012); *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996); *United States v. Caldwell*, 954 F.2d 496, 501 (8th Cir. 1992); *United States v. Connell*, 869 F.2d 1349, 1351 (9th Cir. 1989). The facts underlying the district court's legal conclusion regarding effectiveness, however, should be reviewed for clear error. *Id.*

In this case, after conducting a *de novo* review of the district court's application of the *Seibert* factors, we conclude that the prosecution demonstrated by a preponderance of the evidence that the *Miranda* warnings Wooten received after arriving at FBI headquarters effectively conveyed his rights and rendered his subsequent waiver valid and his confession admissible.

As to the first of the factors that bear on the effectiveness of *Miranda* warnings—"the completeness and detail of the first round of interrogation"—the district court found that Wooten was asked "who lived at the house, the rental situation, and who had computer access . . . . In addition, [the agents] also showed Wooten images of his daughter and asked Wooten to identify her," as well as asking about his ex-girlfriend, the mother of the child. Wooten said that he was

-10-

No. 13-1566
*United States v. Wooten*

also "asked about the thumb drive discovered during the search," but the district court credited the testimony of the agents that this subject did not come up at the scene. The district court later ruled the statements made in the car inadmissible, because they were unwarned. In fact, the information that the FBI gleaned at that point was clearly incomplete and principally concerned information that could have been easily verified by other means. The initial questions and the answers Wooten gave merely confirmed what the agents knew when they applied for the search warrant and protected the innocent co-tenant's computer from seizure. In addition, the agents confirmed the identity of the child in two of the downloaded photographs as Wooten's daughter—a fact that inevitably would have been discovered upon further investigation. When compared to the information that Wooten later provided at FBI headquarters, what the agents learned from Wooten in the car cannot be said to be either "complete" or "detailed," in terms of the first *Seibert* factor. Indeed, the scope and character of the offenses with which the defendant would later be charged could be, and would be, established by the contents of items that the agents were authorized to seize under the search warrant and, in fact, already had in their possession when they first questioned Wooten.

After Wooten was taken to FBI headquarters, he was advised of his *Miranda* rights, he signed a waiver of those rights, and he agreed to answer questions without an attorney present. As to the second *Seibert* factor—the overlapping content of the two statements—there clearly was overlap, but the overlapping content was largely inconsequential and only marginally inculpatory. As the district court found, "Defendant's interview [at the FBI office] covered his e-mail address, his use of various computers, how the home was equipped with internet service," and the identification of his daughter in two photographs. But there was a great deal of

-11-

No. 13-1566
*United States v. Wooten*

additional information conveyed by Wooten, which the FBI interrogators took down and later wrote up in a confession that Wooten signed.

At FBI headquarters, for example, Wooten provided the agents with his cell phone number and identified his cell phone server after turning it over. He acknowledged using a Netbook that belonged to Teltow but denied using a computer located in her part of the house. Wooten was shown an email dated October 20, 2011, and 11 photographs of his daughter attached to the email, which had been sent from "tomwoots@yahoo.com" to "didnotwant@yahoo.com." At first, Wooten told the agents that he did not recall sending the email, but he later admitted that he had. Wooten also tried to convince the agents that he had deleted the photographs after sending them, claiming that he did not intend to send the photographs to anyone when he took them. Eventually, however, he confessed that he had taken the photographs and uploaded them on a file-sharing site called ImageSource, in order to gain access to other users' child pornography. In addition to sending the photographs to "didnotwant@yahoo.com," he said, they were sent to a few other addresses. He also told the agents that he had corresponded with someone at "adog838@yahoo.com" and regularly used a website called GigaTribe to view adog838's folders containing child pornography, securing access by appropriating adog838's screen name and password. Wooten said that he downloaded photographs and videos of child pornography from various GigaTribe users to a thumb drive, which he hid in his bedroom. He denied printing the photographs or saving anything to the Netbook because he did not want anyone to find the images. Wooten said that he had accessed GigaTribe for the last time in August 2011, when he was prompted to pay a monthly fee for access but decided not to do so. When asked about other contacts, Wooten said that he

-12-

No. 13-1566
*United States v. Wooten*

remembered one user on GigaTribe whose screen name began with "Mega," but he could not

recall the rest of the user's name.

Based on this information, the agents drafted a written confession with a waiver of rights,

which Wooten signed. After executing it, Wooten provided the following additional facts: that

he had collected hundreds of photographs and 10-15 videos containing child pornography—all

stored on the thumb drive hidden in his room; that he had first made contact with "adog838" by

reviewing chat logs; and that half the photos and videos came from a user named "Steve-Daddy"

with whom Wooten chatted regularly when signed on as "adog838."

Although one or two items of information that were of interest to the FBI investigators

came to light in their first conversation with Wooten and were repeated by him after he arrived at

the FBI office and waived his *Miranda* rights, the truly inculpatory information that Wooten

provided came during the in-house interrogation. Any overlap was insignificant when measured

against the big picture. Thus, the situation in this case is unlike that in *Seibert*, in which the

Court found that after the first part of the interrogation was finished, and before the Miranda

warnings were given, "little if anything, of incriminating potential [was] left unsaid." *Seibert*,

542 U.S. at 616.

Because Wooten's two statements were also separated both in time and in setting, the

third *Seibert* factor does not weigh as strongly against a finding of effectiveness as it otherwise

might. And, although the "continuity of personnel" at the interrogation at the FBI office (the

fourth factor) is clear, the record does not establish that the agents "treated the second round as

continuous with the first," thereby satisfying the fifth and final *Seibert* factor. After considering

the circumstances as a whole, the district court did not view the statements as one continuous

-13-

No. 13-1566
*United States v. Wooten*

confession "punctuated" with a mid-stream *Miranda* warning and, given the particular facts of this case, neither do we.

We also note the lack of apparent intent on the part of the interrogators to use a "deliberate two-step strategy" designed to secure an essentially unwarned confession—or as some courts have put it, score an "end run around *Miranda*." *See, e.g.*, *United States v. Carter*, 884 F.2d 368, 373 (8th Cir. 1989). The agents were within their rights to confine Wooten temporarily during the execution of the search warrant, and their initial questioning was obviously aimed at ensuring that they had in custody the person actually connected to the IP address under investigation, "tomwoots@yahoo.com," and that the computer they had seized was in fact the one he had used. The request to identify his daughter as the child depicted in two of the photos arguably amounted to unnecessary questioning at that point—unless it was intended to assure the immediate safety of a small child. The district court nevertheless found that there was "no coercion affiliated with the first statement." We cannot say that the district court erred in that finding, based on the totality of the circumstances, or in its conclusion that because Wooten's two statements were separate and distinct, the *Miranda* warnings he received were constitutionally "effective." Hence, as a matter of law, there was no *Miranda* violation under either the *Seibert* plurality test or the narrower articulation of the principle in Justice Kennedy's concurring opinion.

## CONCLUSION

For the reasons set out above, we conclude that district court correctly determined that no *Miranda* violation occurred in this case. It follows that the confession Wooten signed at FBI headquarters was admissible at trial. We therefore AFFIRM the judgment of the district court.

-14-

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Deborah S. Hunt<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: February 25, 2015

Ms. Hala Jarbou
Office of the U.S. Attorney
211 W. Fort Street
Suite 2001
Detroit, MI 48226

Mr. Jeffrey Paul Nunnari
Law Office
3349 Executive Parkway
Suite D
Toledo, OH 43606

Thomas William Wooten
F.C.I. Milan
P.O. Box 1000
Milan, MI 48160

Re: Case No. 13-1566, *USA v. Thomas Wooten*
Originating Case No. : 2:12-cr-20040-1

Dear Mr. Wooten and Counsel,

The Court issued the enclosed (Order/Opinion) today in this case.

Sincerely yours,

s/Michelle M. Davis
Case Manager
Direct Dial No. 513-564-7025

cc:  Mr. David J. Weaver

Enclosure

Mandate to issue